IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

GEORGIA VOCATIONAL REHABILITATION
AGENCY BUSINESS ENTERPRISE PROGRAM et al,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

Civil Action No. 4:18cv148

PUBLIC VERSION

## OPINION & ORDER

This matter comes before the Court on Plaintiffs' Complaint for Temporary Restraining Order and Preliminary Injunction. Doc. 1. On December 11, 2018, this Court GRANTED Plaintiffs' Motion for Temporary Restraining Order and ORDERED the parties to appear on December 14, 2018 for a hearing regarding whether the Court should grant Plaintiffs' request for a preliminary injunction. For the reasons stated below, the Court **GRANTS** Plaintiffs' request for a preliminary injunction under the following terms:

1. Defendant, the United States of America, is **ENJOINED** from proceeding with the procurement of and specifically from making any award of the subject Fort Benning Food Service Contract until a decision in arbitration under the Randolph-Sheppard Act has been rendered or upon further order of this Court.

2. The Court's preliminary injunction is conditioned upon Plaintiffs posting a $100,000 cash or surety bond effective for the duration of the injunction.

3. The Court's preliminary injunction is further conditioned upon GA-SLA and Mr. Lee's company continuing to provide food services to Fort Benning under the same terms

1

provided in the 2016 contract during the duration of the injunction should the appropriate Ft. Benning contracting officer provide the opportunity to do so.

4. Although the Court granted Scott-Grace's motion to intervene, it imposes no obligation upon it in this order. Plaintiffs attempted to call into question Scott-Grace's eligibility to qualify as a veteran owned small business, but there is insufficient evidence before this Court for it to consider this issue.

## I. BACKGROUND

### A. Factual Allegations

This dispute arises under the Randolph-Sheppard Act ("RSA"), which requires federal entities to provide priority for blind persons licensed by state agencies to operate vending facilities on federal property. 20 U.S.C. § 107; 34 C.F.R. § 395.33(a). Plaintiff, Georgia Vocational Rehabilitation Agency Business Enterprise Program ("GA-SLA") is the authorized State Licensing Agency for the state of Georgia, and Plaintiff, Michael Lee ("Mr. Lee") is a "blind person" under the RSA[1]. Plaintiffs have been performing the food services contract at the military base in Fort Benning, GA ("Fort Benning") for the past fifteen (15) years. In 2016, Plaintiffs were awarded a thirty-five-month contract to perform food service operations at Fort Benning, consisting of an eleven-month base period followed by two one-year option periods ("The 2016 Contract"). The Government exercised its first option to renew, but declined to exercise its second option to renew, citing cost as a factor. In 2018, the Government issued a new solicitation (the "Solicitation") for bids to award a five-year contract for the operation of food services at Fort Benning, with a program ceiling of $190 million to be paid over the five-year period. The Solicitation was set aside for Service-Disabled Veteran Owned Small Businesses, with the

---

[1] Because GA-SLA submits the bid on behalf of Mr. Lee and continues to receive funding from Mr. Lee's company throughout the contract, the Court routinely refers to either Mr. Lee or GA-SLA collectively as "Plaintiffs"

2

exception that priority would be given to eligible blind vendors under the RSA. Plaintiffs submitted a proposal for the Solicitation, along with Scott-Grace ("Intervenor Defendant") and ▮ other vendors.

The Government intended to award the contract using the Lowest Priced Technically Acceptable ("LPTA") process, which evaluates: (1) Technical Capability (Subfactor 1, Key Personnel and Qualifications; Subfactor 2, Staffing Plan); (2) Past Performance; and (3) Price. The Solicitation was for an Indefinite Delivery/Indefinite Quantity ("ID/IQ") contract, under which contractors are paid an amount for serving a set range of individuals at each vending facility.[2] As part of the "technical" requirements of the Solicitation, each bid was supposed to contain a staffing plan that accounted for serving each range (also referred to as a "band") at each building included in the Solicitation. Particularly, the Solicitation provided that each bidder "shall identify the burdened labor rates for each of [the] labor categories" for headcount bands in Building 2943.

The Solicitation was also a no discussion solicitation. Accordingly, no discussions with bidders were to take place during the bid process, unless the contracting officer first established a competitive range of bidders or another exception applied.

After evaluating each bid proposal using the LPTA factors, the Government approved of a competitive "range"[3] of bidders. The competitive range of bidders excluded all bidders except for Scott-Grace. Scott-Grace's bid was the only bid that the Government deemed acceptable based on technical capability, past performance, and reasonable price. GA-SLA and another bidder were deemed acceptable based on technical capability and past performance; however, both of their

---

[2] For example, Building 1 may have a projected range of 0-1000, but the ID/IQ Solicitation would also request bidders to propose prices for serving other ranges (bands) at Building 1, such as 1-4000, 4,000-6,000 and 6,000-8,000.
[3] Actually, there was no range as such as only one bidder was selected for the sum of ▮

3

proposed contract prices were deemed "unreasonable." During the evaluation process, the Contract Management Office indicated that GA-SLA and others had submitted fully burdened labor rates, while Scott-Grace alone did not.[4] Scott-Grace's proposal was the only proposal submitted with its original proposed contract price lower than the program ceiling of ▇▇▇▇

On August 17, 2018, the Contracting Officer notified Plaintiffs via letter that their bid was not considered to be within the competitive range.

### B. Procedural History

Plaintiffs filed their complaint for Temporary Restraining Order and Injunctive Relief on November 26, 2018. Doc. 1. On November 27, 2018, Plaintiffs filed their Motion for Temporary Restraining Order. Doc. 2. On December 11, 2018, this Court entered an Order GRANTING Plaintiffs' Motion for Temporary Restraining Order and ordering the parties to appear on December 14, 2018 for a hearing on Plaintiffs' complaint for preliminary injunction. On December 14, 2018, this Court held a hearing on Plaintiffs' complaint for preliminary injunction and continued the temporary restraining order until December 17, 2018 for further briefing and closing arguments. Doc. 34. On December 17, 2018, the Court considered the further briefing and heard closing arguments regarding Plaintiffs' complaint for preliminary injunction.

---

[4] See Doc. 32-1 ("Hogston Decl."), Ex. B.

## II. LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, the court may issue a preliminary injunction after notice has been provided to an adverse party. Fed. R. Civ. P. 65. A preliminary injunction is an "'extraordinary remed[y] involving the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances." Sarsour v. Trump, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017).

Accordingly, for the Court to issue a preliminary injunction a party must make a clear showing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)) (internal quotations omitted); see also Pashby v. Delia, 709 F.3d 307, 320-21 (4th Cir. 2013) (each element of the test must be satisfied). Irreparable harm means harm that is "neither remote nor speculative, but actual and imminent." Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991). When evaluating whether to issue an injunction, a court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24.

## III. ANALYSIS

### A. The Randolph-Sheppard Act

When a state licensing agency disputes a federal entity's compliance with the RSA, the RSA requires that the state licensing agency file a complaint with the Secretary of Education to arbitrate the dispute before a district court can review the merits of the state licensing agency's claims. See 20 U.S.C. § 107d-1; Maryland State Dep't of Educ. v. U.S. Dep't of Veterans Affairs, 98 F.3d 165, 167 (4th Cir. 1996). Plaintiffs have filed a complaint for arbitration with the Secretary

of Education, pursuant to the RSA. Doc. 1-3. Plaintiffs, however, request that this Court exercise ancillary jurisdiction to issue a preliminary injunction enjoining the Government from awarding a new contract pending completion of arbitration under the RSA.

### A. The Court's Jurisdiction and Authority to Grant Relief Under Rule 65 of Federal Rules of Civil Procedure

In the Government's final briefing and closing argument, the Government asked this Court to consider a case recently decided by the Western District of Oklahoma where the court agreed that a state licensing agency had not "invoked a cognizable exercise of the court's equity powers and that [Federal Rule of Civil Procedure 65] . . . cannot serve as both a cause of action in a pleading and a basis for the same relief sought via motion." Ok. Dep't of Rehab. Serv's v. United States, Case No. 5:18cv1197, ECF No. 10 at 3-4 (W.D. Ok. Dec 17, 2018). There, the plaintiff had filed a complaint seeking a temporary restraining order and preliminary injunction to enjoin the Army from continuing procurement activity, including award a contract in connection with the procurement activity, until arbitration was completed under the RSA. Oklahoma Dep't of Rehab. Serv's, Case No. 5:18cv1197 at 3. Subsequently, the plaintiff filed a motion for a temporary restraining order seeking the same relief as was requested in its complaint. Id.

The Western District of Oklahoma reasoned that because the state licensing agency sought the same outcome in its request for temporary restraining order as it did in the underlying pleading, rather than maintain the status quo until the court reached the merits of the parties' dispute, "the [state licensing agency] would accomplish its ultimate litigation objective if the court ruled for it on its motion." Id. Therefore, the Western District of Oklahoma found that it would be improper for the court to use its equitable powers to grant the state licensing agency's motion for temporary restraining order or preliminary injunction because the state licensing agency's action constituted

6

a "suit for traditional injunction in the abstract." Id. at 5 (citing Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1127 (11th Cir. 2005).

A "suit for traditional injunction in the abstract" is the principle that a suit for injunctive relief cannot stand unless it is based upon "some independent legal right . . . being infringed." Alabama, 424 F.3d at 1127. The Western District of Oklahoma distinguished a Tenth Circuit opinion affirming a district court's decision to issue an injunction pending RSA arbitration, reasoning that the Tenth Circuit did not address the specific issue of "the need for a complaint asserting a cause of action to support a law suit before a TRO can be issued." Oklahoma Dep't of Rehab. Serv's, Case No. 5:18cv1197 at 5-6 (citing Kansas ex. rel. Kansas Department for Children & Families v. SourceAmerica, 874 F.3d 1226, 1231-32 (10th Cir. 2017). The court noted that the plaintiff had not sought an injunction pursuant to anything "other than the Court's traditional equity power and Rule 65."

Plaintiffs cite persuasive case law that supports this Court's authority to issue an injunction pending arbitration under Federal Rule of Civil Procedure. In Randolph-Sheppard Vendors of America v. Weinberger, the D.C. Court of Appeals reversed a district court's decision to decide an RSA case on the merits before arbitration but admonished that a plaintiff seeking to preserve its rights under the RSA "should have sought a stay or an injunction against the contract awards pending arbitration." 795 F.2d 90 (1986) (citing Fed. R. Civ. P. 65); see also Colorado Department of Human Services v. United States, 74 Fed. Cl. 339, 347 (2006) ("[i]f a court may eventually have jurisdiction of the substantive claim, the court's incidental equitable jurisdiction. . . gives the court authority to impose a temporary restraint in order to preserve the status quo pending ripening of the claim for judicial review.") (citation omitted) (acknowledging that challenges under the RSA are ultimately reviewed by the district court); see also Merrill Lynch, Pierce, Fenner & Smith, Inc.

7

v. Bradley, 756 F.2d 1048 (4th Cir. 1985) (affirming district court's issuance of preliminary injunction pending arbitration under the Federal Arbitration Act). This motion may also be distinguishable from the Oklahoma Dep't of Rehab. Serv's motion as a letter of intent to award the contract to Scott-Grace effective January 1, 2019 has been issued.[5]

Here, the relief requested does not amount to a "suit for traditional injunction in the abstract" because the suit for injunctive relief is based on Plaintiffs' independent legal right to arbitrate the Government's alleged failure to comply with the Randolph Sheppard Act. As noted in this Court's previous Order, the RSA, provides that:

> Whenever any State licensing agency determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of this chapter or any regulations issued thereunder (including a limitation on the placement or operation of a vending facility as described in section 107(b) of this title and the Secretary's determination thereon) such licensing agency may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d-2 of this title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.

20 U.S.C. §107d-1 (emphasis added). Once the Secretary receives any such complaint, the Secretary "shall convene an ad hoc arbitration panel . . . give notice, conduct a hearing, and render its decision which shall be subject to appeal and review as a final agency action for purposes of [the APA]" 20 U.S.C. § 107d-2. If the panel finds that an act or practice of an agency or department violates the RSA, then the head of that department is instructed to terminate the act or practice and take "such other action as may be necessary to carry out the decision of the panel." Id.

---

[5] The Government wrote a letter to Scott-Grace on November 28, 2018 advising him that his proposal "has been accepted by the Government for award." See Doc. 31-2 ("DeRosier Decl.") at 7.

8

Plaintiffs have filed a complaint for arbitration with the Department of Education alleging that the Government's decision to exclude Plaintiffs from the competitive range violated the RSA. Plaintiffs are presently performing the contract at Fort Benning. If Plaintiffs had been included in the competitive range, under the RSA Plaintiffs would have received priority to perform the contract at Fort Benning, subject only to limited exceptions. The RSA gives this Court authority to review the arbitration panel's decision as a final agency action under the Administrative Procedure Act. 20 U.S.C. § 107d-2. Therefore, the Court **FINDS** that it has jurisdiction to grant injunctive relief to maintain the status quo of Plaintiffs and Defendant's contractual relationship while their arbitration is pending pursuant to Federal Rule of Civil Procedure 65.

**B. Merits of Injunctive Relief**

*i. Likelihood of Success on the Merits*

To show that their substantive claim—that the Government violated the R-S Act by not referring the issue of price reasonableness of [their] proposal to the Secretary of Education for her binding determination—is likely to succeed on the merits, Plaintiffs point to the merits of two decisions of R-S Act arbitration panels. Doc. 3 at 12 (citing Kansas v. United States, 171 F. Supp. 3d at 1159) ("while the Court is not bound by these panel decisions, they are entitled to respectful consideration, particularly because a similar arbitration panel will decide this similar dispute."). The two cases are Colorado Department of Human Services, Division of Vocational Rehabilitation, Business Enterprise Program, Case No. R-S/10-06 (May 20, 2012) (the "Colorado Arbitration"), and Opportunities for Ohioans with Disabilities v. United States Department of the Air Force, No. R-S/16-08 (Feb. 22, 2018) (the "Ohio Arbitration").

In the Colorado Arbitration, the State Licensing Agency was eliminated from the competitive range because of price, and the Air Force did not consult with the Secretary of

Education at any time about the issue of price reasonableness. The arbitration panel found that "the Air Force Violated 34 C. F. R. § 395.33(a) when it failed to consult with the Secretary of Education." Doc. 3-1 at 11-15. The panel further reasoned that "even if the state licensing agency's bid is not within the competitive range set by the contracting agency, the matter still must be returned to the Secretary to decide, after consulting with the contracting agency, if the blind vendor can provide an operation at a reasonable cost, with food of a high quality." Id. at 14. Similarly, in the Ohio Arbitration, the Ohio Arbitration panel majority ruled that "[t]he statutory and regulatory scheme make it clear that an SLA's bid cannot be rejected without consulting with the Secretary of Education who makes the final decision. 34 C.F.R. § 395.33(a)." Id.

As noted in the CFR, the Government was only required to consult the Secretary after a determination that the bid was "judged to be within a competitive range." Id (citing N. Carolina Div. of Servs. For Blind v. United States, 53 Fed. Cl. 147, 164 (2002), aff'd sub nom N. Carolina Div. of Servs. For the Blind v. United States, 60 F. App'x 826 (Fed. Cir. 2003) ("[T]he DOE regulations require an SLA's proposal to be within the competitive range or have a reasonable chance of being selected for final award before applying the priority set forth under section 395.33(a)"); Kentucky v. United States, 759 F.3d 588, 592 (6th Cir. 2014) ("If the state licensing agency's proposal, according to the neutral, pre-published criteria, is within a 'competitive range' and the Department of Education ("DOE") agrees with the state licensing agency's assessment of the vendors qualifications, the blind vendor will be awarded the contract."); NISH v. Cohen, 247 F.3d 197, 203 (4th Cir. 2001) ("If the agency determines that the SLA proposal is competitive . . . the agency is to consult with DOE. See id. § 395.33(b), (d). If, however, the SLA proposal is determined not to be within the competitive range, the agency may award the contract to the most highly evaluated offeror.")

AR 210-25 contains similar language. Doc. 12 at 18 (citing AR 210-25 6b(1)(a) ("If the [SLA] submits a proposal and it is not within the competing range established by the contracting officer, award may be made to another offeror following normal procurement procedures . . .").

At the hearing on Plaintiffs' TRO, the Government argued that its determination of the competitive range was consistent with the Federal Acquisition Regulation ("FAR") which describes the process by which the Government is to determine the competitive range. See 48 C.F.R. §§ 15.300-15.307. The FAR sets forth a requirement that the source selection authority shall "[e]stablish an evaluation team, tailored for the particular acquisition, that includes appropriate contracting, legal, logistics, technical, and other expertise to ensure a comprehensive evaluation of offers." 48 C.F.R. § 15.303

The FAR also provides instructions for how the Government is required to determine cost or price evaluation, see 48 C.F.R. §15.305, and the discussions that the Government is supposed to have with offerors regarding determined to be within the competitive range, 48 C.F.R. § 15.306.

In the Court's previous Order, the Court noted that it did not appear that the Government conferred with GA-SLA before determining that its bid was not competitive, as it was unclear whether such communications would have been appropriate before the establishment of the competitive range. However, the parties have clarified that this was a "no discussions" solicitation and it is undisputed that no discussions or communications took place with any offerors prior to the Government's determination of the competitive range.

The crux of Plaintiffs' argument deals with section 15.306(c)(1), which states that agencies are to evaluate all proposals in accordance with section 15.305(a) and "[b]ased on the ratings of each proposal against all evaluation criteria, the contracting officer shall establish a competitive range comprised of all the most highly rated proposals." Section 15.305(a) provides three criteria

for assessing the competitive range: (1) the technical evaluation; (2) the past performance evaluation; and (3) the cost or price evaluation. 48 C.F.R. § 15.305. While highly rated in the past performance and technical evaluation, Defendants allege that Plaintiffs were excluded from the competitive range solely because of their ranking in the "cost or price" evaluation category as set forth in 48 C.F.R. 15.305(a)(1), which states:

> (1) Cost or price evaluation. Normally, competition establishes price reasonableness. Therefore, when contracting on a firm-fixed-price or fixed-price with economic price adjustment basis, comparison of the proposed prices will usually satisfy the requirement to perform a price analysis, and a cost analysis need not be performed. In limited situations, a cost analysis (see 15.403–1(c)(1)(i)(B)) may be appropriate to establish reasonableness of the otherwise successful offeror's price. When contracting on a cost-reimbursement basis, evaluations shall include a cost realism analysis to determine what the Government should realistically expect to pay for the proposed effort, the offeror's understanding of the work, and the offeror's ability to perform the contract. Cost realism analyses may also be used on fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts (see 15.404–1(d)(3)). (See 37.115 for uncompensated overtime evaluation.) The contracting officer shall document the cost or price evaluation.

48 C.F.R. § 15.305.

The Court **FINDS** that Plaintiffs have established a clear likelihood of success on the merits. It appears that the Government violated its own regulations. As noted above, Scott-Grace was the only bidder who was included in the competitive range; however, it appears that Scott-Grace's proposal did not meet the technical requirements of the solicitation. A bidder must be found qualified by a separate authority under factor (1) the technical evaluation and factor (2) past performance before factor (3) cost or price evaluation (also referred to as "competitive range") may be considered. As the Government's witness, Patrick Hogston's, exhibit B establishes, Scott-Grace's initial bid did not meet the technical evaluation at the time that it was found to be in the competitive range. Factor (2) past performance was omitted by Mr. Hogston in the bid selection. Mr. Hogston testified that correcting the technical issues resulted in an increase to Scott-Grace's

bid of somewhere between ▇ million dollars and thereby exceeded the firm fixed price of ▇. Tr. 12/14/18 144:17-25. Exhibit B to Mr. Hogston's declaration also indicates that the Government was aware of this error before determining the competitive range. See Doc. 32-1 at 26 ("Hogston Decl. Ex. B"). The Court notes that another offeror, whose outline of employee cost was less than one percent higher than Scott-Grace's, was excluded from the competitive range for being "technically" unacceptable on the basis that this offeror had omitted an element of its proposal that could be fixed with "minor revisions." See Doc. 32-1 at 33. The Government's evaluation also in effect eliminated past performance as a factor to be considered in the selection of the contract. The Government solicitation of bids approved by Mr. Hogston indicated that, where there was no past performance, the selecting officer, also Mr. Hogston may find it neutral and, therefore, acceptable. Tr. 12/14/18 at 174:1-175:5.

All the testimony regarding the competitive nature of Scott-Grace's bid referenced the bid price of their contract before an upward adjustment was applied. See generally Tr. 12/14/18. Mr. Hogston repeatedly testified that the Government was not concerned with the bid being too low, only with it not being too high, yet after he determined the competitive range, he raised the bid to a figure in excess of ▇ million which placed the bid beyond the established cap of ▇. See e.g. Prelim. Inj. Tr. 12/14/18 118:21-119:14. It appears that no competitive range was determined, but that the governmental authority simply picked a number and selected the only bidder who provided a bid which was originally lower than that number.[6]

Additionally, the source selection authority, again Mr. Hogston gave inconsistent testimony regarding the Government's process for determining whether a price is competitive. Mr. Hogston testified that he used a chart of the price per meal at all facilities Army wide to

---

[6] Before a bidder's pricing is considered the entity must comply with (1) technical requirements (which Scott-Grace failed to do) and (2) Past Performance (which Mr. Hogston effectively eliminated from the process).

13

determine whether the proposed contract prices for the Fort Benning contract were competitive.[7] Prelim Inj. Tr. 12/14/18 148:24-149:7, 168:11-170:21. The Court asked Mr. Hogston whether he picked the lowest costs per meal off the chart to establish the competitive nature of the bids and Mr. Hogston said that he did not. Prelim. Inj. Tr. 196:17-197:14. Mr. Hogston mentioned several factors mainly dealing with flexibility and negotiations. Prelim. Inj. Tr. 197:5-8. However, when he wrote the guidelines pursuant to which the solicitation had to be issued, he did not provide flexibility in the contract. In fact, the only change that the evidence shows has taken place in his new system as opposed to the old one is that REAs (equitable adjustments to the total contract cost) have been eliminated as a practice beginning with Fort Benning in 2017.

Regarding negotiations, the solicitation was a no discussion solicitation, which would eliminate any discussion until the competitive range was determined, which prevents state agencies such as GA-SLA from explaining why their bids may be more than the number that constituted the competitive range. The Government denies that any effort was made on its part to exclude state agencies; however, the testimony of Mr. Hogston indicates that the Government had this very thing in mind as both discussions and past performance were eliminated from consideration and the three lowest costs per meal Army wide were used as the comparators.[8]

As Scott-Grace's bid was not technically acceptable, the only two companies that would have met the first two requirements and become eligible for competitive price determination would

---

[7] The Chart is attached to this Opinion as Exhibit A. A correction is noted as to Fort Lee from Mr. Hogston's testimony. See Prelim. Inj. Tr. 12/14/18 196:4-10 (Mr. Hogston explained that the price per meal for Fort Lee, which was listed as ▓ on the chart, should have been ▓ per meal).

[8] Fort Lee had a cost per meal of approximately ▓ per meal, Fort Jackson ▓ per meal, and Fort Leonard Wood ▓. The initial Fort Benning bid by Scott-Grace was ▓ per meal, which is ▓ lower than the next lowest, Fort Lee, which was awarded pursuant to Mr. Hogston's new system and approximately ▓ lower than the average for schoolhouse Army posts. In preparing Exhibit 1, the chart, Mr. Hogston placed the "schoolhouse" posts in the separate category entitled TRADOC as their primary mission is schooling the troops and their meal counts are more predictable and therefore lower on the average. See Defendant's Exhibit 1 ("Cost Spreadsheet").

have been Plaintiffs and another experienced bidder, ▇ whose prices were very close to each other.

### ii. Irreparable Harm

The Court **FINDS** that Plaintiffs have clearly established that they will suffer irreparable harm absent a preliminary injunction. As noted in the Court's Temporary Restraining Order, Plaintiffs have shown that the loss of the Fort Benning contract has the potential to eliminate a large portion of GA-SLA's funding for the training of blind licensees in the state of Georgia, as well as the jobs of numerous individuals currently performing the Fort Benning contract for Mr. Lee.

The Court originally believed that a brief injunction period of thirty (30) to sixty (60) days would permit the arbitration hearing granted by 20 U.S.C. 107d-2 to be concluded as the parties have marshalled a complete outline of the evidence they need for such a proceeding. However, the Government's counsel candidly advised the Court that it often took approximately one year to complete the arbitration. Such a period of time would greatly exacerbate the permanent harm to Plaintiffs, whose remedies through a successful arbitration are limited and do not include loss of shared profits to GA-SLA and Mr. Lee. The status quo would be irreparably altered if the contract were awarded to Scott-Grace or any other bidder before the arbitration panel rules. In recognition of this harm and the mission to feed the troops, GA-SLA and Mr. Lee have agreed to continue to perform this mission pursuant to an extension of this mission through May 31, 2019 in accord with the terms of the 2016 Ft. Benning contract if provided the opportunity to do so in order to give the arbitration board time to act.

In addition to the facts highlighted in the Court's Temporary Restraining Order, additional harm has been shown through the testimony of Alan DeRosier, the president of Intervenor

Defendant's joint venture. Mr. DeRosier testified that he would offer jobs to all the union employees and the management employees of the plaintiff with no reduction in benefits. Prelim. Inj. Tr. 12/14/18 218:18-219:18. However, it is difficult to determine how he could accomplish this as his total hour labor requirements are ▮ percent lower than those of the plaintiff. Further, Mr. DeRosier testified that his projected staffing requirements were based on feeding the number of individuals at ▬▬▬▬▬▬▬▬▬▬ as opposed to Mr. Lee who projected them at ▬▬▬▬▬▬▬▬▬▬. Prelim. Inj. Tr. 12/14/18 2:08:13-20. Further, as part of the joint venture, Mr. DeRosier has agreed to allocate a large percentage of jobs to his subcontractor, ▬▬▬▬[9] which include all cooks and those who supervise the cooks. See Prelim. Inj. Tr. 225:15-25.

### iii - iv. Balance of Equities and Public Interest

As noted in the Court's Temporary Restraining Order, the balance of equities and public interest in granting a temporary restraining order weigh in favor of Plaintiffs as the Government violated its own rules in determining that Scott-Grace was eligible to compete for the competitive price range. Mr. DeRosier did not appear to understand the contract, which is not surprising due to his lack of experience as the prime contractor. When asked who would bear the costs of cost overruns he said that he did, Prelim. Inj. Tr. 12/14/18 213:21-23, and if he exceeded the fixed price he would have to "eat it as an owner." Id. 213:24-214:6. However, he later testified if more meals than projected were ordered by the Government, he assumes he would receive an REA (equitable adjustment). Id. 216:19-2:17:7. This appears to be the manner in which Mr. DeRosier handled meal overruns in his prior work as a subcontractor for ▬▬▬▬ as well as by Mr. Lee during his first 14 or so years at Fort Benning where he said there were meal overruns seventy percent (70%) of the time. Prelim. Inj. Tr. 12/14/18 51:16-52:18, 78:12-15, 79:4-13. Mr. Lee testified that the

---

[9] Mr. DeRosier's company worked as a subcontractor for ▬▬▬▬ for approximately 14 years.

Government paid for the actual meals served under all of the previous contracts until they failed to renew in 2017. It appears the only substantial change Mr. Hogston has made to the food service contracts is the termination of REAs beginning with Fort Benning in 2017.

In summary it appears that Mr. DeRosier did what he thought he had to do to win the contract and would worry about overruns and profits later. For example, when he computed a percentage of profit he chose ▇▇▇▇ instead of ▇▇▇▇▇▇ ▇ because "Bottom line, I just wanted to win the contract." Prelim. Inj. Tr. 12/14/18 218:4-5. After the Government improperly fixed the competitive range, it increased the Scott-Grace bid from ▇▇▇▇ to ▇▇▇▇▇ million dollars ▇▇▇▇ plus, according to Mr. Hogston's testimony (the Government never produced written evidence of the final contract sum). Prelim. Inj. Tr. 12/14/18 118:21-119:14. Not only does the public interest prefer a fixed and transparent process, but it is also interested in furthering the purposes of the RSA as well as furthering the Georgia State programs for the blind and the continued employment of the incumbent staff.

Although the Government argues that awarding the contract to Scott-Grace would save the Army millions of dollars, the evidence indicates otherwise. It is improbable that Scott-Grace could feed the troops in a timely and acceptable manner for the amount of their bid. This improbability will approach impossibility if the number of troops to be fed increases as Mr. Lee has warned. The army recognizes the probable increase in meals served when it increased the maximum meals under the top band from 7,000 to 8,000 meals, yet the amount of the fixed price has decreased ▇ million per year from the 2016 Fort Benning contract. The most probable outcome for the proposed Scott-Grace contract is the same as GA-SLA's 2016 contract, increased meals will cause the proposed Scott-Grace contract to come up short on money and if no REAs are granted it will

be rebid before its termination date. As for Scott-Grace's promise to offer employment to Mr. Lee's union and management employment, its performance appears well beyond reach ab initio.

### IV. CONCLUSION

The Court **FINDS** that the evidence presently before the Court supports a likelihood that Plaintiffs will succeed on the merits, that Plaintiffs will suffer irreparable harm, and that the balance of equities and public interests weigh in favor of granting Plaintiffs' request for Preliminary Injunction pending arbitration. Accordingly, the Court **GRANTS** Plaintiffs' request for preliminary injunction and **ENJOINS** Defendant the United States of America as set forth herein.

The Clerk is **REQUESTED** to send a copy of this Order including Exhibit A to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
January 22, 2019