1        IN THE UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF VIRGINIA

3            Newport News Division

4   - - - - - - - - - - - - - -x

5   GEORGIA VOCATIONAL         :

6   REHABILITATION AGENCY      :

7   BUSINESS ENTERPRISE        :

8   PROGRAM, et al.,           :

9        Plaintiffs,    :    Civil Action No.

10    v.                  :    4:18-cv-148

11   UNITED STATES OF           :

12   AMERICA,                   :    Full Version

13        Defendant.     :    Contains Confidential

14   - - - - - - - - - - - - - -x   Information

15         Videotaped Deposition of the

16          UNITED STATES OF AMERICA,

17         By and Through Its Designee

18               GARY STEVENS

19            Conducted Virtually

20          Tuesday, August 30, 2022

21                12:38 p.m.

22    Job No.: 461749

| | | |
|---|---|---|
| 1 | my question.  I'll do my best to let you finish | 12:41:53 |
| 2 | your answer.  If you haven't finished, just let me | 12:41:55 |
| 3 | know.  Is that okay? | 12:41:59 |
| 4 | A  Yes, sir, perfect. | 12:42:00 |
| 5 | Q  Appreciate it.  And just as you -- as you | 12:42:02 |
| 6 | did just now, please make sure that all of your | 12:42:05 |
| 7 | answers are verbal so that the court reporter can | 12:42:07 |
| 8 | get them down rather than shaking -- shaking your | 12:42:11 |
| 9 | head or nodding your head.  Okay? | 12:42:14 |
| 10 | A  Correct. | 12:42:19 |
| 11 | Q  If at any time you want to take a break | 12:42:19 |
| 12 | during this deposition, you're welcome to do so. | 12:42:21 |
| 13 | We'll just ask that if there's a question pending, | 12:42:24 |
| 14 | that you finish answering the question before you | 12:42:25 |
| 15 | take a break.  Okay? | 12:42:28 |
| 16 | A  Okay. | 12:42:30 |
| 17 | Q  All righty.  What is your current position | 12:42:32 |
| 18 | with the Army, Mr. Stevens? | 12:42:38 |
| 19 | A  Currently, I am a division chief, an 1102, | 12:42:41 |
| 20 | which is a supervisory contract specialist for the | 12:42:48 |
| 21 | Mission and Installation Contracting Command, | 12:42:52 |
| 22 | Installation Readiness Center, at Fort Sam | 12:42:56 |

| # | | Time |
|---|---|---|
| 1 | Houston. | 12:43:05 |
| 2 | Q  And in that position, what are your | 12:43:05 |
| 3 | responsibilities? | 12:43:11 |
| 4 | A  Currently, I have the Full Food Services | 12:43:11 |
| 5 | Division chief.  So, we are tasked with awarding | 12:43:16 |
| 6 | contracts for full food services and DFA, dining | 12:43:19 |
| 7 | facility attendant contracts for the Army.  We | 12:43:23 |
| 8 | have currently been assigned most of the full food | 12:43:28 |
| 9 | service and dining facility contracts but not all | 12:43:31 |
| 10 | of them. | 12:43:33 |
| 11 | Q  And you said you have the Full Food | 12:43:37 |
| 12 | Services Division chief.  Does that person report | 12:43:41 |
| 13 | to you or you are that person? | 12:43:43 |
| 14 | A  I am that person. | 12:43:46 |
| 15 | Q  Okay.  And in that capacity, you said you | 12:43:47 |
| 16 | have responsibility for most, but not all, of the | 12:43:53 |
| 17 | Army's full food service and dining facility | 12:43:56 |
| 18 | attendant contracts.  Did I understand that | 12:43:59 |
| 19 | correctly? | 12:44:01 |
| 20 | A  That is correct. | 12:44:01 |
| 21 | Q  How many full food services contracts are | 12:44:05 |
| 22 | you responsible for? | 12:44:07 |

| | | |
|---|---|---|
| 1 | A  Currently we have awarded 20 -- I believe | 12:44:11 |
| 2 | it's 23 as of yesterday, and then we have | 12:44:16 |
| 3 | another -- I believe it's 12 -- 12 or 13 that are | 12:44:21 |
| 4 | still in the works. | 12:44:27 |
| 5 | Q  And that's -- if I say, "FFS," you | 12:44:30 |
| 6 | understand that to mean full food service; | 12:44:33 |
| 7 | correct? | |
| 8 | A  Yes. | 12:44:36 |
| 9 | Q  So, you have award -- you, the Army -- | 12:44:36 |
| 10 | under your supervision, the Army has awarded 23 | 12:44:40 |
| 11 | full food service contracts? | 12:44:43 |
| 12 | A  Correct. | 12:44:46 |
| 13 | Q  How many of those full food service | 12:44:48 |
| 14 | contracts have been awarded to state licensing | 12:44:51 |
| 15 | agencies under the Randolph Sheppard Act? | 12:44:54 |
| 16 | A  I think all of them, with the exception | 12:44:58 |
| 17 | of -- let's see.  I think there was only three -- | 12:45:01 |
| 18 | three or maybe four that were not awarded to the | 12:45:09 |
| 19 | SLA. | 12:45:16 |
| 20 | Q  Okay.  How many dining facility attendant | 12:45:16 |
| 21 | contracts are you responsible for? | 12:45:24 |
| 22 | A  In that number of the 23, that also | 12:45:27 |

| | | |
|---|---|---|
| 1 | included full food services and dining facility | 12:45:30 |
| 2 | contracts. | 12:45:33 |
| 3 | Q  Okay.  So, are there -- of the 23, are | 12:45:34 |
| 4 | some of them DFA only? | 12:45:45 |
| 5 | A  Yes. | 12:45:49 |
| 6 | Q  Okay.  How many of those 23 contracts are | 12:45:50 |
| 7 | only dining facility attendants? | 12:45:54 |
| 8 | A  I believe at this time, it was only four, | 12:45:58 |
| 9 | maybe five, that were just strictly DFAs. | 12:46:02 |
| 10 | Q  And of those four or five, how many have | 12:46:13 |
| 11 | been awarded to a state licensing agency? | 12:46:16 |
| 12 | A  To my knowledge, there was only one, and | 12:46:19 |
| 13 | that was -- I want to say it was Fort Bliss, and | 12:46:24 |
| 14 | then the others are under the Ability One | 12:46:30 |
| 15 | procurement list. | 12:46:33 |
| 16 | Q  Okay.  Of the 18 or 19 contracts that you | 12:46:36 |
| 17 | have responsibility for that are full food | 12:46:51 |
| 18 | service, are any of those on Ability One's | 12:46:55 |
| 19 | procurement list? | 12:47:00 |
| 20 | A  There's only one that is a dining facility | 12:47:03 |
| 21 | and full food service contract that is on the | 12:47:07 |
| 22 | Ability One list at this time, and that is | 12:47:11 |

1    actually one that we just awarded yesterday.          12:47:12

2        Q    Where is that?                               12:47:15

3        A    That's at Fort Hood.                         12:47:16

4        Q    Do you have any objections to awarding       12:47:37

5    contracts under the Randolph Sheppard Act?            12:47:39

6        A    Do I have any objections to it?              12:47:44

7        Q    Yes, sir.                                    12:47:46

8        A    No, none at all.                             12:47:48

9        Q    In your experience, are contracts awarded    12:48:00

10   under the Randolph Sheppard Act any more or less      12:48:07

11   expensive, on average, than contracts awarded to      12:48:12

12   Ability One, one of its contractors?                  12:48:19

13       A    Could you repeat the question one more       12:48:19

14   time, please.                                         12:48:22

15       Q    In your experience, are contracts awarded    12:48:22

16   pursuant to the Randolph Sheppard priority any        12:48:24

17   more or less expensive to the Army than contracts     12:48:27

18   awarded pursuant to Ability One's priority?           12:48:30

19       A    The -- I guess the biggest difference        12:48:40

20   there is, with the exception of only one, we do       12:48:42

21   not have any full food service contracts that are     12:48:47

22   under the Ability One program or the Ability One      12:48:50

| | | |
|---|---|---|
| 1 | as far as the arbitration and other discussions, | 13:02:22 |
| 2 | I'm not aware of what's going on with that. | 13:02:26 |
| 3 | Q  Let me turn to some more Fort Benning | 13:02:43 |
| 4 | specific questions, if that's okay with you, | 13:02:46 |
| 5 | Mr. Stevens. | 13:02:48 |
| 6 | Could you describe your role with respect | 13:02:49 |
| 7 | to food services at Fort Benning. | 13:02:52 |
| 8 | A  So, for the Fort Benning full food | 13:02:57 |
| 9 | services contract, I am what is considered the | 13:03:00 |
| 10 | procuring contracting officer.  So, the full food | 13:03:02 |
| 11 | services in my division, the actions that we take | 13:03:07 |
| 12 | on is strictly the pre-award side of it only. | 13:03:10 |
| 13 | So, we go out; we gather all of the | 13:03:14 |
| 14 | requirement documents and we put them together. | 13:03:18 |
| 15 | We issue solicitations.  We receive proposals.  We | 13:03:20 |
| 16 | evaluate proposals.  We make award decisions and | 13:03:23 |
| 17 | we award contracts.  And then after a contract is | 13:03:26 |
| 18 | awarded, we transfer them back to the local | 13:03:30 |
| 19 | offices for administration. | 13:03:35 |
| 20 | So, in the Fort Benning full food services | 13:03:36 |
| 21 | contract, I am responsible for doing just the | 13:03:38 |
| 22 | pre-award side of it and doing all things I just | 13:03:41 |

1    the information that we need to go out and solicit          13:17:49

2    for full food services.  So, that's where we get           13:17:53

3    our information from.                                       13:17:57

4        Q  So, we had the opportunity this morning to          13:18:21

5    take the deposition of Deborah Barthell, the               13:18:24

6    contracting officer's representative, and she              13:18:27

7    identified a Ms. Addison as the contracting                13:18:31

8    officer.  Could you walk through for me, please,           13:18:34

9    the hierarchy -- actually, strike that.                    13:18:41

10        I understand from what you said, there is             13:18:44

11   sort of the operations side, which is Ms. Barthell         13:18:48

12   and the folks above her and the folks under her,           13:18:52

13   for that matter, and then there's the procuring            13:18:55

14   side, and that's you and the folks above and below         13:18:58

15   you.  Do I understand that correctly?                      13:19:01

16       A  Yes, that's -- that's pretty close.  So,            13:19:05

17   we have a -- to simplify it, we call it a                  13:19:07

18   pre-award and a post-award side.  So, we work              13:19:11

19   everything from the pre-award up to the award.             13:19:15

20   And then you have your admin contracting office,           13:19:17

21   administrative contracting office, that would be           13:19:21

22   doing everything in the post-award side, which             13:19:23

1  would be the actual oversight of the contract                13:19:26

2  execution itself.                                            13:19:29

3      Q  So, you're in charge of the pre-award                 13:19:37

4  side, correct, for this -- for this contract?                13:19:40

5      A  Yes, sir.                                              13:19:43

6      Q  Have you ever been to Fort Benning with               13:19:44

7  respect to this contract?                                    13:19:51

8      A  No, sir.                                               13:19:53

9      Q  In whatever way is easiest for you, could             13:20:02

10 you just go through the hierarchy of folks who               13:20:05

11 report, either from the bottom going up, up to               13:20:08

12 you, or from you going down, who's responsible for           13:20:11

13 the pre-award side of the contract, what their               13:20:16

14 names are and what their positions are?                      13:20:18

15     A  I'll try to.  Again, you know, I'm -- I'm              13:20:22

16 a little bit cautious about naming names in the               13:20:29

17 organization and in the chain of command above               13:20:34

18 myself.                                                      13:20:39

19     Q  Okay.  Let's go -- let's just -- for now,             13:20:39

20 let's stay below yourself.  As I say, whatever is            13:20:42

21 easiest for you, start at the bottom and go up or            13:20:47

22 start at you and go down on the pre-award side of            13:20:51

| | | |
|---|---|---|
| 1 | want to be within 20 feet of the Randolph Sheppard | 13:28:55 |
| 2 | Act, if at all possible"? | 13:28:58 |
| 3 | MR. PORTER:  I just want to put an | 13:29:00 |
| 4 | objection on the record that we are far afield | 13:29:02 |
| 5 | from the topics in the 30(b)(6), as well as the | 13:29:04 |
| 6 | representations in the motion to the Court as to | 13:29:08 |
| 7 | why Mr. Stevens was needed for a deposition. | 13:29:10 |
| 8 | With that, go ahead, Mr. Stevens, answer | 13:29:14 |
| 9 | his question if you can. | 13:29:16 |
| 10 | A  And you said 2014?  I -- | 13:29:20 |
| 11 | Q  Yes, sir. | 13:29:22 |
| 12 | A  I have no knowledge of any email or | 13:29:23 |
| 13 | anything along that lines. | 13:29:26 |
| 14 | Q  Have you ever heard anything along that | 13:29:28 |
| 15 | lines from anyone at the Army, that they want to | 13:29:30 |
| 16 | stay away from the Randolph Sheppard Act, if at | 13:29:32 |
| 17 | all possible? | 13:29:36 |
| 18 | MR. PORTER:  Continuing objection. | 13:29:37 |
| 19 | Q  You can answer. | 13:29:42 |
| 20 | A  I have not heard any statements like that, | 13:29:43 |
| 21 | and, you know, that's -- I would say that coming | 13:29:46 |
| 22 | from my division, that's -- that's not our -- | 13:29:50 |

1   that's not our intent.  That's not our sentiment.          13:29:54

2   I have absolutely nothing against the SLAs or the          13:29:57

3   Randolph Sheppard Act, so, no, that's not in --            13:30:01

4   not in my division, not what we do.                        13:30:07

5       Q   Thank you.  So, this morning, as I                 13:30:16

6   mentioned earlier and as I think you knew, we had          13:30:19

7   the opportunity to take Mr. Barthell's deposition          13:30:22

8   as the contract -- she's the -- as you know, the           13:30:27

9   contracting officer's representative, as you               13:30:30

10  described, the contracting officer's eyes and ears         13:30:32

11  at Fort Benning.                                           13:30:35

12      And Ms. -- Ms. Barthell testified that she             13:30:37

13  is entirely satisfied with the food services being         13:30:42

14  provided by Rolling Hills and GVRA at Fort                 13:30:44

15  Benning.  Does the Army agree that GVRA and                13:30:51

16  Rolling Hills are currently doing a good job of            13:30:56

17  provide food services at Fort Benning?                     13:30:58

18      A   I have not personally looked at the                13:31:03

19  performance of -- any of the past performance on           13:31:06

20  the bridge contracts that are being performed              13:31:10

21  right now, so the -- the current bridge contract.          13:31:12

22      I have not heard any negative issues or                13:31:16

1    you said, for anything, as long as they get the        13:57:45

2    proper approvals; correct?                             13:57:47

3        A   Yes, it's still -- yes, I mean it's, you        13:57:50

4    know, kind of being broad but, essentially, you        13:57:54

5    know, if you have the proper approvals and             13:57:56

6    justifications, you know, most contracts you can       13:57:59

7    modify.  In some cases, it may be more appropriate     13:58:03

8    to award a standalone contract for a portion of        13:58:07

9    something.  So, I mean there's different ways to       13:58:11

10   do it.                                                 13:58:14

11       Q   Okay.  So, I want to go through the            13:58:16

12   changed circumstances that you listed in your --       13:58:20

13   or the allegedly changed circumstances that you        13:58:24

14   listed in your declaration, Mr. Stevens, as            13:58:26

15   justification for modifying the preliminary            13:58:29

16   injunction.                                            13:58:32

17          The first one you listed was an increased       13:58:33

18   need for takeout meals, but would you agree with       13:58:36

19   me that as of today, there is no increased need        13:58:40

20   for takeout meals at Fort Benning?                     13:58:43

21       A   I believe there still is a need to have        13:58:47

22   that takeout meal priced and in a new contract,        13:58:50

1    although it may not be used today, but we do          13:58:54

2    anticipate that it would be used in the future,       13:58:58

3    and it does come in line with the category of         13:59:01

4    management in all of our full food services           13:59:06

5    contracts, so we're trying to get them all            13:59:10

6    aligned, and that -- that is part of it, as well.     13:59:12

7         Q   I understand that.  Let me repeat back       13:59:15

8    what I think I just heard, and tell me if I           13:59:18

9    understood you correctly.                             13:59:22

10        The Army is moving towards new contracts         13:59:24

11   for full food services that include line items for   13:59:34

12   takeout, line items for 100 percent takeout,          13:59:41

13   anticipating that it may need those things in the     13:59:44

14   future, but there is no need today or in the          13:59:47

15   immediate future for -- to make use of those          13:59:52

16   options at Fort Benning; correct?                     13:59:58

17        A   This --                                      14:00:02

18        MR. PORTER:  Objection to the extent it          14:00:03

19   calls for him to speculate.                           14:00:04

20        Q   You can answer.                              14:00:08

21        A   This -- this is from -- from my position     14:00:10

22   as awarding these contracts is that we are under      14:00:13

1    the impression it's not if they will be needed,          14:00:18

2    it's when they will be needed, whether it's              14:00:21

3    through a pandemic or a -- a deployment of, you           14:00:24

4    know, a large number of soldiers or facilities           14:00:29

5    being closed, so they have to do takeout.  So,           14:00:32

6    it's not an "if," it's a "when" they will be             14:00:36

7    needed.                                                   14:00:38

8        Q  So -- but sitting here today, does the            14:00:41

9    Army have any knowledge of a specific need at any        14:00:47

10   time in the remainder of 2022 to make use of those       14:00:50

11   changes?                                                  14:00:55

12       A  I can't say to anything specific in the           14:00:58

13   remainder of 2022 at Fort Benning.                       14:01:01

14       Q  And even if you were allowed to solicit a         14:01:04

15   new contract, that new solicitation wouldn't go          14:01:08

16   into effect until, at the earliest, summer of            14:01:11

17   2023; correct?                                            14:01:15

18       A  I -- I wouldn't give a date.  I would say         14:01:19

19   it would probably actually be able to be posted          14:01:22

20   much sooner than that.  I would like to see it,          14:01:27

21   you know, if we were approved to do it, you know,        14:01:30

22   the sooner the better, but I don't think it would        14:01:32

1    take us until summer '23, by any means.                    14:01:35

2        Q  Well, you-all signed a bridge contract               14:01:39

3    with GVRA that runs until June of 2023; correct?            14:01:43

4        A  Okay.  So, there's a clarification there.            14:01:48

5    So, we could issue a solicitation, but that                 14:01:51

6    doesn't mean we would be ready to award until               14:01:55

7    later on.  So, typically, from solicitation                 14:01:57

8    release to receipt of proposal could be anywhere            14:02:01

9    from 90 days, sometimes more, and then we go to             14:02:06

10   evaluation and proposal.                                    14:02:13

11       So, to, I guess, state it better, from the              14:02:15

12   time we issue a solicitation to award, if we were           14:02:18

13   given approval to issue a solicitation before the           14:02:23

14   end of the year, it would be -- it would be                 14:02:25

15   summer -- summer '23.  So, you would be correct on          14:02:28

16   that point.                                                 14:02:31

17       Q  In addition to what you described as an              14:02:33

18   increased need for takeout meals, that was the              14:02:53

19   first justification you listed as a changed                 14:03:00

20   circumstance.  The second one was changes in wages          14:03:03

21   since 2018; correct?                                        14:03:07

22       A  I believe, yes.                                      14:03:11

1    Q  And the changes in wages since 2018 have          14:03:13

2  all been adequately accommodated under the bridge      14:03:23

3  contracts; correct?                                    14:03:26

4    A  They should be.  They should be -- the            14:03:30

5  bridge contracts should be operating under the         14:03:32

6  current CBA, collective bargaining agreements.         14:03:35

7    Q  And the bridge contracts, therefore, there       14:03:38

8  was a currently operating under the current CBA,       14:03:46

9  including complying with President Biden's             14:03:49

10  Executive Order 14026 for a $15 minimum wage;         14:03:52

11  correct?

12    A  That should be correct, as well.  They           14:03:59

13  should be operating under the new executive order     14:04:02

14  and the -- a CBA.                                      14:04:04

15    Q  So, would you agree that there's no need         14:04:06

16  for a new contract to comply with the wages that      14:04:10

17  are currently in effect at Fort Benning; correct?     14:04:17

18    A  I would say that, again, you know, your          14:04:21

19  bridge contracts are awarded, and they would have     14:04:25

20  to be in accordance with the CBAs, and now that       14:04:28

21  it's past the January of '22, that the executive      14:04:33

22  order would be in place, so -- so, yes, I mean new     14:04:36

| | | |
|---|---|---|
| 1 | solicitation, they would still have to go out. | 14:04:41 |
| 2 | But, again, what I was comparing to was a | 14:04:43 |
| 3 | 2018 solicitation to the 2000 -- I'll call it the | 14:04:46 |
| 4 | "2022 solicitation." So, there's the difference. | 14:04:52 |
| 5 | Bridge contracts are separate from the | 14:04:57 |
| 6 | solicitation. In my declaration, that's what I | 14:04:58 |
| 7 | was comparing it to. | 14:05:04 |
| 8 | Q So, you were comparing current wages to | 14:05:04 |
| 9 | what was under the solicitation in 2018 but, in | 14:05:07 |
| 10 | fact, the 2018 wages have changed as we -- as the | 14:05:10 |
| 11 | years have passed and there have been new | 14:05:15 |
| 12 | collective bargaining agreements and the new | 14:05:18 |
| 13 | executive order from the President; correct? | 14:05:20 |
| 14 | A Correct, and that's my understanding is | 14:05:22 |
| 15 | the comparison is from the 2018 solicitation, | 14:05:24 |
| 16 | which is what we're still, I guess, in arbitration | 14:05:28 |
| 17 | on. It's not -- | 14:05:32 |
| 18 | Q No, I appreciate -- | 14:05:33 |
| 19 | A It's not -- it's not comparing, you know, | 14:05:34 |
| 20 | the bridge contracts. I'm just comparing to | 14:05:36 |
| 21 | the 2018 solicitation. | 14:05:40 |
| 22 | Q I appreciate that, Mr. Stevens. I -- my | 14:05:42 |

1    question was just a little bit different, which is          14:05:46

2    is there anything in any way that the preliminary           14:05:48

3    injunction prevents the Army from paying the wages          14:05:55

4    required under the collective bargaining agreement          14:06:02

5    or the executive order?                                     14:06:05

6        A  I would not think so.                                14:06:09

7        Q  The third thing that you listed in your              14:06:15

8    declaration as a justification for -- or as a               14:06:17

9    changed circumstance that would justify modifying           14:06:25

10   the preliminary injunction was the Army's desire            14:06:28

11   to change the contract type from noncommercial to           14:06:32

12   commercial.                                                 14:06:38

13       And did I understand you correctly when we              14:06:39

14   were talking about this before, the Army has a              14:06:41

15   desire in the future to have food service                   14:06:44

16   contracts be categorized as commercial; correct?           14:06:49

17       A  What we found in 2018, and this was about           14:06:58

18   the same time that this solicitation was posted            14:07:01

19   and released, that we had issued a separate                14:07:04

20   solicitation as a noncommercial, and we were               14:07:08

21   actually protested.  There was numerous different          14:07:10

22   questions and concerns with the fact that the              14:07:16

| | | |
|---|---|---|
| 1 | government, the Army, was utilizing a | 14:07:19 |
| 2 | noncommercial approach. | 14:07:22 |
| 3 | And, so, we went back and we re-looked at | 14:07:25 |
| 4 | the commerciality and determined that full food | 14:07:28 |
| 5 | services were commercial in nature. So, we have | 14:07:31 |
| 6 | since categorized all full food service actions as | 14:07:35 |
| 7 | commercial. So, all contracts that we've awarded | 14:07:39 |
| 8 | since 2018 have been commercial. | 14:07:42 |
| 9 | Q  But the Army still has some full food | 14:07:46 |
| 10 | service contracts in effect not only at Fort | 14:07:49 |
| 11 | Benning but elsewhere that continue to be | 14:07:52 |
| 12 | noncommercial; correct? | 14:07:55 |
| 13 | A  Yes, sir, that's probably true, but that | 14:07:57 |
| 14 | is another reason why the Army has gone to the | 14:08:00 |
| 15 | Center of Excellence or to our Full Food Services | 14:08:04 |
| 16 | Division is to get all full food services the | 14:08:08 |
| 17 | same, to get them all aligned as commercial | 14:08:11 |
| 18 | ID/IQs, five-year base ordering periods, the | 14:08:14 |
| 19 | same -- same essential PWS, the same requirements | 14:08:16 |
| 20 | across the Army so we don't have that wide | 14:08:20 |
| 21 | variance. | 14:08:23 |
| 22 | And it is much easier for contractors on a | 14:08:23 |

1    commercial solicitation/commercial contract, and          14:08:27

2    eventually, I would think, it would actually be            14:08:30

3    cheaper for contractors to operate under                   14:08:33

4    commercial vice noncommercial.                             14:08:36

5        Q   I appreciate that.  Has the Army done              14:08:37

6    anything to -- to cancel or change existing                14:08:44

7    noncommercial food services contracts in order to          14:08:49

8    re-solicit them as commercial?                             14:08:56

9        A   I think it's just the normal attrition             14:08:59

10   because since we have -- since we've been taken            14:09:01

11   over, like I said, we've -- we've -- we've                 14:09:03

12   completed, I want to say, it's probably 60, 70,            14:09:04

13   75 percent of all Army contracts right now, and            14:09:10

14   we're actually coming around on the second --              14:09:14

15   second iteration of the requirements.                      14:09:17

16       So, as any of them that were remaining                 14:09:19

17   noncommercial coming up for recompete or re --             14:09:22

18   competition, that we are doing them as commercial.         14:09:25

19       Q   So, if GVRA had been awarded this contract        14:09:30

20   to begin in early 2019, it would have been a               14:09:34

21   five-year plus six-month dash-eight extension that         14:09:37

22   would have taken to the -- them to the middle of           14:09:41

| | | |
|---|---|---|
| 1 | 2024, and you would have just -- you, the Army, | 14:09:44 |
| 2 | would have just left this contract as | 14:09:49 |
| 3 | noncommercial through the middle of 2024, and | 14:09:51 |
| 4 | then, when you re-solicited it to begin in the | 14:09:54 |
| 5 | middle of 2024, you would have changed it to | 14:09:57 |
| 6 | commercial; is that correct? | 14:10:00 |
| 7 | A  If it would have still -- if it had not | 14:10:01 |
| 8 | had any other outliers like, you know, performance | 14:10:06 |
| 9 | issues or anything like that, if it had been | 14:10:09 |
| 10 | awarded at that time in early 2019, it would | 14:10:11 |
| 11 | actually be back on our radar.  We would actually | 14:10:15 |
| 12 | be working on a recompete for it because a | 14:10:19 |
| 13 | contract of this size, they do take a long time to | 14:10:22 |
| 14 | get through the process.  So, we would probably | 14:10:25 |
| 15 | already be working on it, and we'd already be | 14:10:27 |
| 16 | looking at it for a re-compete. | 14:10:29 |
| 17 | But to answer your question, yes, sir. | 14:10:31 |
| 18 | Q  But to answer my question, you would have | 14:10:33 |
| 19 | left -- absent performance issues, you would have | 14:10:35 |
| 20 | left the -- the current contract for five years | 14:10:38 |
| 21 | and six months and then recompeted it as a | 14:10:41 |
| 22 | commercial contract to begin in the summer of | 14:10:45 |

| | | |
|---|---|---|
| 1 | 2024; is that correct? | 14:10:47 |
| 2 | A  I would say, more than likely, we probably | 14:10:51 |
| 3 | would have.  Again, you know, it's -- it's a lot | 14:10:54 |
| 4 | of time and -- time and labor to put into these. | 14:10:57 |
| 5 | So, without any other outside issues, concerns, we | 14:11:02 |
| 6 | probably would have left it and just let it run | 14:11:04 |
| 7 | its course and then recompete it. | 14:11:07 |
| 8 | Q  From -- from the point of view of the | 14:11:10 |
| 9 | soldier being fed, is there any difference whether | 14:11:14 |
| 10 | the contract is categorized as commercial or | 14:11:17 |
| 11 | noncommercial? | 14:11:20 |
| 12 | A  From food actually hitting the plate, I -- | 14:11:26 |
| 13 | I don't -- I can't think of anything off the top | 14:11:30 |
| 14 | of my head that would really make a difference to | 14:11:31 |
| 15 | a soldier getting fed. | 14:11:34 |
| 16 | Q  In terms of the services that the | 14:11:43 |
| 17 | contractor is providing, is there any difference | 14:11:44 |
| 18 | whether it's categorized as commercial or | 14:11:47 |
| 19 | noncommercial? | 14:11:51 |
| 20 | A  The -- the actual labor services performed | 14:11:51 |
| 21 | by the contractor, yes, I would say there are | 14:11:54 |
| 22 | differences.  And, you know, feeding the soldiers, | 14:11:56 |

1    the soldiers getting fed, they're probably --          14:12:00

2    they're not going to see it but, you know, the         14:12:03

3    actual work performed would be slightly different      14:12:06

4    as far as especially oversight.                        14:12:11

5        Q   Okay.  And the commercial contract would       14:12:14

6    just give the contractor a little more flexibility     14:12:26

7    with respect to that oversight; is that correct?       14:12:28

8        A   Actually, commercial contracts give           14:12:32

9    everybody a little more flexibility.  It's -- it's     14:12:35

10   a win/win.  You know, in my opinion, doing             14:12:39

11   contracting for almost 20 years, it's a win/win        14:12:41

12   for both industry, the contractor, and the            14:12:43

13   government to do them commercial.  And it's -- you     14:12:46

14   know, essentially, it's the right thing to do.         14:12:49

15       Q   So, what are the differences, in terms of      14:12:52

16   a food services contract, depending on whether         14:12:55

17   it's categorized as noncommercial or commercial?       14:12:59

18       A   Well, what -- what the contracting officer     14:13:04

19   would be looking at when they're trying to make a      14:13:07

20   commercial determination is is it something that       14:13:10

21   would be typically provided by general industry        14:13:13

22   off-the-shelf type stuff.  So, would it be             14:13:18

1    something very similar to what's being fed --                14:13:21

2    being utilized in a school, a school system, in a            14:13:23

3    hospital, different things of that nature -- a               14:13:27

4    cafeteria, you know, as Randolph Sheppard Act, you           14:13:30

5    know, talks about cafeteria style.  So, we look at           14:13:34

6    those type things as to make a commercial                    14:13:37

7    determination.                                               14:13:39

8         Commercial is easier in the fact that                   14:13:42

9    there's a lot less restrictions; there's a lot               14:13:45

10   less clauses that the contractor is ultimately               14:13:48

11   responsible for.  Rather, there may be something             14:13:51

12   that's very small, very uncommon.  In a                       14:13:55

13   noncommercial, it's there.  So, something could              14:13:58

14   come up and, you know, they would still be                   14:14:01

15   responsible for it.                                          14:14:04

16        In a commercial, it's a lot more                        14:14:05

17   forgiving.  It is more a commercial standard                 14:14:08

18   practice.  So, what commercial standards practices           14:14:11

19   are used in, you know, hospital or cafeteria or              14:14:14

20   school could still be used in our government                 14:14:19

21   contracts under commercial -- under commerciality.           14:14:22

22        Q   Any other material differences between               14:14:29

| | | |
|---|---|---|
| 1 | changed circumstances? | 14:55:53 |
| 2 | A  I would say, "yes," if they were on a -- | 14:55:54 |
| 3 | and I'll call it a "permanent contractor on a | 14:55:58 |
| 4 | permanent -- a competed contract."  Other than -- | 14:56:03 |
| 5 | put it this way:  Other than a bridge contract, I | 14:56:06 |
| 6 | would say, "yes, your statement is correct? | 14:56:08 |
| 7 | MR. FREEMAN:  Thank you.  No further | 14:56:13 |
| 8 | questions. | 14:56:14 |
| 9 | MR. PORTER:  Mr. Stevens, I have a few | 14:56:16 |
| 10 | questions for you. | 14:56:18 |
| 11 | EXAMINATION BY COUNSEL ON BEHALF OF THE DEFENDANT | 14:56:19 |
| 12 | BY MR. PORTER: | 14:56:20 |
| 13 | Q  Just to follow up with last question | 14:56:20 |
| 14 | Mr. Freeman asked you, the contract that existed | 14:56:24 |
| 15 | prior to the 2018 solicitation was a so-called | 14:56:26 |
| 16 | "permanent contract"; correct? | 14:56:30 |
| 17 | A  Yes, sir. | 14:56:33 |
| 18 | Q  And it was -- it was a contract of the | 14:56:34 |
| 19 | nature where there was a one-year base period | 14:56:36 |
| 20 | followed by option years and out years up through | 14:56:39 |
| 21 | five; correct? | 14:56:45 |
| 22 | A  I believe that is correct. | 14:56:45 |

1    Q  And the 2018 solicitation sought to issue                    14:56:46

2    the same type of contract, a one-year base with                 14:56:50

3    option years; correct?                                          14:56:53

4    A  Correct.                                                     14:56:56

5    Q  The proposal that the Army would like to                     14:56:58

6    do now would change the whole format of that to                 14:57:01

7    a -- a contract that -- that was a five-year                    14:57:05

8    period with task orders that may or may not be                  14:57:09

9    issued; is that true?                                           14:57:12

10       MR. FREEMAN:  Objection as to form.                         14:57:15

11    A  That is correct.  So, the Army would like                   14:57:18

12    to issue a solicitation for a five-year base                   14:57:21

13    period with the dash -- and we call it "the dash                14:57:26

14    eight," as an option to extend for six months.  It             14:57:32

15    actually makes it easier for the contractor and                14:57:35

16    for the government contracting officials to                    14:57:37

17    administer the contract.                                       14:57:39

18    Q  And one of the -- one of the things you                     14:57:41

19    were just saying to Mr. Freeman was that, in                   14:57:43

20    essence, the bridge contract situation that we are             14:57:46

21    currently in is different in terms of                          14:57:49

22    modifications than a permanent contract would be;              14:57:53

| | | |
|---|---|---|
| 1 | is that right? | 14:57:59 |
| 2 | MR. FREEMAN:  Objection. | 14:57:59 |
| 3 | A  Yes, yes, so, a bridge contract is much | 14:58:02 |
| 4 | different because, in terms of a bridge contract, | 14:58:05 |
| 5 | it is to maintain the status quo and typically | 14:58:08 |
| 6 | used in a case for, like, a protest.  So, for a | 14:58:12 |
| 7 | CCA stay, you need to maintain the status quo of | 14:58:18 |
| 8 | the contract.  Same thing in this case with the | 14:58:20 |
| 9 | injunction; it would have to maintain as close as | 14:58:22 |
| 10 | we can to the status quo because of the CCA, the | 14:58:26 |
| 11 | Competition and Contracting Act, where normally we | 14:58:32 |
| 12 | would be out competing but, you know, when we're | 14:58:35 |
| 13 | in a sole source environment, it's much more | 14:58:38 |
| 14 | stringent guidelines that we have to follow. | 14:58:40 |
| 15 | So, yes, they are different. | 14:58:44 |
| 16 | Q  And, so -- | 14:58:45 |
| 17 | MR. FREEMAN:  Mr. Porter -- Mr. Porter, | 14:58:47 |
| 18 | could I -- so I don't have to keep interrupting | 14:58:50 |
| 19 | you, can I have a continuing objection to your | 14:58:51 |
| 20 | leading questions, please? | 14:58:54 |
| 21 | MR. PORTER:  Sure. | 14:58:55 |
| 22 | MR. FREEMAN:  Thank you. | 14:58:56 |

| | | |
|---|---|---|
| 1 | BY MR. PORTER: | 14:58:58 |
| 2 | Q  The bridge contract that is -- is in place | 14:58:58 |
| 3 | now, are bridge contracts forward-looking? | 14:59:00 |
| 4 | A  No, bridge contracts, when they are | 14:59:07 |
| 5 | awarded, again, they -- we have to have a | 14:59:11 |
| 6 | justification and approval, and part of that | 14:59:14 |
| 7 | justification and approval has to be how the | 14:59:16 |
| 8 | contracting officer or the contracting office | 14:59:21 |
| 9 | plans to get that contract to a point where it can | 14:59:24 |
| 10 | be competed. | 14:59:28 |
| 11 | So, that's one of the things that we have | 14:59:30 |
| 12 | to justify is -- and I can give a quick example, | 14:59:31 |
| 13 | if you like, or, if not, it's up to you-all. | 14:59:35 |
| 14 | Q  Please, would you. | 14:59:39 |
| 15 | A  Okay.  So, example, if you have a sole | 14:59:40 |
| 16 | source contract, it's on a bridge contract and, in | 14:59:44 |
| 17 | your justification, you can explain that, in the | 14:59:52 |
| 18 | period of after the first six months, you're going | 14:59:55 |
| 19 | to try to get that PWS or that requirement to a | 14:59:58 |
| 20 | point where it can be competed amongst either, you | 15:00:02 |
| 21 | know, full and open competition or small | 15:00:05 |
| 22 | businesses or whatever, so you have to have an out | 15:00:08 |

| | | |
|---|---|---|
| 1 | of that sole source environment of a way to get | 15:00:12 |
| 2 | that requirement to a -- to meet the Competition | 15:00:14 |
| 3 | and Contracting Act.  So, that's part of your | 15:00:19 |
| 4 | justification and approval. | 15:00:23 |
| 5 | Q  Are there limits to how far you can go or | 15:00:24 |
| 6 | how long you can go with bridge contracts? | 15:00:27 |
| 7 | A  I think, typically, I -- I think, | 15:00:32 |
| 8 | typically, it's they try to stay under one year. | 15:00:37 |
| 9 | So, you can a lot of times do a six-month with a | 15:00:41 |
| 10 | six-month option to extend.  In certain | 15:00:45 |
| 11 | circumstances, you can go longer but, again, it | 15:00:48 |
| 12 | has to be a very good justification. | 15:00:50 |
| 13 | Q  Mr. Freeman was asking you questions about | 15:00:56 |
| 14 | the ability to modify or change or add line items | 15:00:58 |
| 15 | to a bridge contract.  Do any of those types of | 15:01:05 |
| 16 | changes alter the 2018 solicitation that is now | 15:01:08 |
| 17 | the subject of this litigation? | 15:01:13 |
| 18 | MR. FREEMAN:  Objection. | 15:01:21 |
| 19 | A  I'm sorry.  Who was that question to? | 15:01:27 |
| 20 | Q  That was -- that was to you, Mr. Stevens. | 15:01:29 |
| 21 | My question was Mr. Freeman had talked to you | 15:01:32 |
| 22 | about modifications to bridge contracts for the | 15:01:34 |

1   various changes you've described and the                15:01:38

2   circumstances you've described.  And my question        15:01:41

3   to you, do those changes to bridge contracts            15:01:44

4   modify in any way or form the 2018 solicitation         15:01:47

5   that is the subject of this litigation?                 15:01:53

6       MR. FREEMAN:  Objection.                            15:01:57

7       A  So, I'm not sure what all modifications          15:02:01

8   have been done to the bridge contract.  I know,         15:02:04

9   again, there's been numerous bridge contracts, so       15:02:06

10  I'm not sure how many different modifications           15:02:09

11  there's been.                                           15:02:12

12      Again, all contracting officers are                 15:02:13

13  cautioned any time they are modifying a bridge          15:02:16

14  contract because it's -- it can vary easily get         15:02:19

15  outside of the scope, to within the scope of work       15:02:23

16  that is authorized under bridge contract                15:02:28

17  situations.                                             15:02:30

18      Q  All right.  Do any of the -- if, as              15:02:32

19  Mr. Freeman asked you, if there were line items to      15:02:36

20  change the amount of takeout meals in a bridge          15:02:40

21  contract, does that alter any of the terms of the       15:02:43

22  2018 solicitation?                                      15:02:47